*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 23-CF-0387

BRIAN C. CARRUTH, APPELLANT,

V.

UNITED STATES, *et al.*, APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(2021-CF2-006934)

(Michael K. O'Keefe, *Judge*)

(Argued January 20, 2026                                    Decided July 16, 2026)

*David H. Reiter* for appellant.

*Daniel J. Lenerz*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Nicholas P. Coleman*, and *Julian Ginos*, Assistant United States Attorneys, were on the briefs, for appellee United States.

*Bryan J. Leitch*, Assistant Attorney General, with whom *Brian L. Schwalb*, Attorney General for the District of Columbia, *Caroline S. Van Zile*, Solicitor General, and *Ashwin P. Phatak*, Principal Deputy Solicitor General, *Thais-Lyn Trayer*, Deputy Solicitor General, and *Anne A. Deng*, Assistant Attorney General, were on the briefs, for appellee District of Columbia.

*Alice Wang*, with whom *Jaclyn S. Frankfurt* and *Sarah McDonald* were on the briefs, for Public Defender Service, as *amicus curiae*.

Before HOWARD and SHANKER, *Associate Judges*, and RUIZ, *Senior Judge*.

SHANKER, *Associate Judge*: In December 2021, appellant Brian C. Carruth drove from Ohio into the District of Columbia with a rifle that was not registered in the District and its ammunition in his pickup truck. He was charged with carrying a rifle within the District of Columbia (D.C. Code § 22-4504(a-1)), possession of an unregistered firearm (D.C. Code § 7-2502.01(a)), and unlawful possession of ammunition (D.C. Code § 7-2506.01(a)(3)), and he proceeded to a jury trial, at which he testified in his defense. When the government's cross-examination of Mr. Carruth ran up against an hour-long lunch break, the trial court ordered Mr. Carruth not to "discuss the substance of" his testimony with his lawyer during the break.

Mr. Carruth was convicted of all three offenses and has appealed, arguing that the evidence was insufficient to support his conviction for carrying a rifle under D.C. Code § 22-4504(a-1) and that Section 22-4504(a-1) is unconstitutional under the Second Amendment. He also asserts that all of his convictions must be vacated because the trial court's order barring him from discussing the substance of his testimony with his lawyer during the lunch break violated his Sixth Amendment right to the assistance of counsel. Because Mr. Carruth challenged the constitutionality of a D.C. statute, we invited the District of Columbia to intervene as an appellee and the Public Defender Service of the District of Columbia (PDS) to participate as amicus curiae.

Prior to oral argument, the United States moved under D.C. Code § 17-306 to vacate Mr. Carruth's rifle-carrying conviction due to the government's changed position on the constitutionality of the statute. Mr. Carruth did not oppose the motion, and the District of Columbia, as intervenor, also did not oppose, although it maintained its position that the rifle-carrying statute is constitutional. PDS as amicus opposed vacatur on the government's motion, arguing for resolution of the constitutionality question on the merits in a published opinion.

Following oral argument, the United States Supreme Court decided *Villarreal v. Texas*, 607 U.S. 465 (2026), which addressed whether a trial court order prohibiting a defense attorney from "'managing' the defendant's testimony" during an overnight recess violated the defendant's Sixth Amendment right to the assistance of counsel. *Id.* at 761. We invited Mr. Carruth and the United States to provide supplemental briefing addressing *Villarreal*, and they did so.

We conclude that the trial court's order barring Mr. Carruth from discussing the substance of his testimony did not violate Mr. Carruth's Sixth Amendment rights, and we affirm his convictions for possessing an unregistered firearm and possessing ammunition without a valid firearm registration certificate. We grant the government's motion for vacatur of Mr. Carruth's rifle-carrying conviction under D.C. Code § 22-4504(a-1) and remand for further proceedings in the trial court.

## I. Background

## A. Factual Background

In December 2021, Mr. Carruth traveled from his home state of Ohio to Washington, D.C., to see the city and to pursue a possible employment opportunity at the United States Department of the Interior. Mr. Carruth was pulled over while driving in the District by a Metropolitan Police Department (MPD) officer who "observed . . . a rifle case mounted to the truck bed" of Mr. Carruth's red Chevy Silverado. Upon being asked if he had any weapons in the truck, Mr. Carruth initially said no and claimed that the case in the truck bed held only "camping equipment." But he then told a different officer that he had a rifle in the truck.

MPD officers found an unloaded Remington 783 bolt-action rifle stored in a padlocked rifle case in the back of the cab of the truck. The weapon was not stolen, but Mr. Carruth did not have a District of Columbia registration for it. Officers also found live bullets in an "ammo case" located in the back of the truck cab on the passenger side. Mr. Carruth was charged with carrying a rifle in the District, possessing an unregistered firearm, and possessing ammunition without a valid firearm registration certificate.

Mr. Carruth testified in his defense at trial. He stated that although he was driving in the District that day, his intent was "potentially to go camping somewhere . . . not in D.C." and not to stay in the District for any extended period of time. He testified that he did not initially mention a "weapon" in his truck because the rifle was "locked and secured [while] being transported," and, therefore, he "would not describe this hunting rifle as a weapon." According to Mr. Carruth, the key for the rifle case padlock was located "on the same keychain as the key to [his] truck," and "the case was latched in the four locations" during his drive. He also testified that "the firing pin and the bolt were removed from the rifle and put separately," rendering the rifle "not active."

During the government's cross-examination of Mr. Carruth, the trial court announced a break for lunch lasting approximately one hour. Because Mr. Carruth was still under oath, the government asked the court to instruct Mr. Carruth "not to discuss his testimony . . . with his counsel." The trial court agreed and directed Mr. Carruth as follows: "So now that you're on the stand, Mr. Carruth, you should not be speaking to your lawyer about the substance of your testimony." Mr. Carruth, through counsel, objected on the ground that this restriction violated his Sixth Amendment right to the assistance of counsel. Mr. Carruth contended that he had an "absolute right" to discuss his testimony with his attorney "at any time, whether he's on the stand or not," with the only limitation being that counsel could not "coach"

or "rehearse" him. The trial court overruled this objection and again instructed Mr. Carruth: "Don't discuss your testimony with anyone, please."

The jury found Mr. Carruth guilty of all charges. This appeal followed.

## B. Procedural Background on Appeal

Mr. Carruth initially raised three challenges on appeal: (1) that there was insufficient evidence for a jury to convict him of carrying a rifle under D.C. Code § 22-4504(a-1) because he had established the affirmative defense set out in D.C. Code § 22-4504.02(b) relating to the manner of transporting a firearm in a vehicle; (2) that Section 22-4504(a-1) is unconstitutional as applied to him under the Second Amendment; and (3) that the trial court's order forbidding him from discussing his ongoing testimony with his lawyer during the lunch break violated the Sixth Amendment. He did not raise a Second Amendment challenge to his failure-to-register or ammunition convictions.

Initially, the United States opposed each of Mr. Carruth's arguments, contending that the evidence was sufficient for his rifle-carrying conviction, that the Second Amendment did not invalidate that conviction, and that the trial court's order did not violate the Sixth Amendment. Because Mr. Carruth had challenged the constitutionality of a D.C. statute, we informed the D.C. Office of the Attorney

General (OAG). *See* D.C. App. R. 44(b) (providing that if a "party questions the constitutionality of an act of the Council of the District of Columbia" in a proceeding where "the District of Columbia . . . is not a party in an official capacity," the Clerk of the Court must "certify this fact" to the D.C. OAG). In the same order, we invited PDS to participate as amicus curiae. *See* D.C. App. R. 29 (governing the participation of amicus curiae in an appeal). We granted the District's subsequent motion to intervene as an appellee, and PDS provided notice of its intent to file an amicus brief.

After the District filed its brief, the United States moved to vacate Mr. Carruth's rifle-carrying conviction "in the interests of justice" because "[i]t is the United States's position that Section 22-4504(a-1) is unconstitutional" and "the United States is not prosecuting violations of Section 22-4504(a-1)." The United States also represented that if we granted its motion, it would "move to dismiss that count of the indictment under Superior Court Rule of Criminal Procedure 48(a)" on remand. Neither Mr. Carruth nor the District opposed the motion, although the District maintained that Section 22-4504(a-1) is constitutional. PDS opposed the United States' motion, urging us to reach the merits of Mr. Carruth's Second Amendment challenge and hold that the statute is unconstitutional.

After oral argument, the United States Supreme Court decided *Villarreal v. Texas*, 607 U.S. 465 (2026), in which it interpreted and applied two precedents governing the interaction between the Sixth Amendment right to the assistance of counsel and a trial court's power to limit a testifying defendant's contact with their counsel during the testimony. We invited Mr. Carruth and the United States to provide supplemental briefing "addressing (1) the effect of *Villarreal* on appellant's Sixth Amendment claim and (2) the effect of *Villarreal* on this court's cases relating to a defendant's Sixth Amendment right to consult with counsel during trial recesses or breaks." They both did so.

## II. The Motion to Vacate

We first address the United States' motion to vacate Mr. Carruth's conviction under D.C. Code § 22-4504(a-1). No party to this appeal opposes the government's motion: Mr. Carruth "does not oppose" it, and the District, in its capacity as an intervenor, "does not object" to us granting it either. Only PDS as amicus opposes the motion, arguing that we must address the merits of the Second Amendment issue rather than granting the motion outright in order to avoid "subvert[ing] the orderly development of precedent on this important constitutional issue of first impression." It also suggests that we should not take at face value the United States' representation regarding its policy of not prosecuting Section 22-4504(a-1) violations, and that we

should decide the Second Amendment issue because "the validity of a criminal conviction and its underlying statute are matters of public interest and importance."

We recognize that we are not required to grant the United States' motion to vacate, but we likewise reject PDS's assertions that we have an "obligation to decide the issue" in a published, precedential opinion and that "'the interests of justice' require this Court to say" that the rifle-carrying statute is unconstitutional in such an opinion. Under D.C. Code § 17-306, we may "vacate . . . any order or judgment of a court . . . as is just in the circumstances." And on a number of prior occasions we have exercised our discretionary authority to grant an unopposed motion to vacate a conviction on appeal. *See, e.g.*, *Miller v. United States*, 346 A.3d 166, 169 (D.C. 2025) (granting the United States' motion to vacate a conviction "due to a changed position regarding the constitutionality of the statute," where the District, as an intervenor-appellee, "did not object" despite "maintaining its position that the statute is constitutional"); *Williams v. United States*, 354 A.3d 306, 317 (D.C. 2026) (granting the government's unopposed motion to vacate a conviction for possession of a large-capacity ammunition feeding device under D.C. Code § 7-2506.01(b) where the government moved to vacate because of its "view that Section 7-2506.01(b) is unconstitutional"); *Fields v. United States*, 952 A.2d 859, 859 n.1 (D.C. 2008) (noting that a consolidated case had earlier been "dismissed pursuant to the government's unopposed motion to vacate [the appellant's] conviction");

*Edwards v. United States*, 328 A.2d 90, 91 (D.C. 1974) (vacating the appellant's assault with a dangerous weapon charge because the government "concede[d] the validity of appellant's second claim of error"). *Cf. United States v. Hooper*, 432 F.2d 604, 606 (D.C. Cir. 1970) (vacating a conviction in "the interest of justice," and declining to address the merits, where the government agreed that the conviction should be vacated and the court concluded that several factors related to the "general interest of the administration of justice" supported vacatur).[1]

---

[1] In *Hooper*, the D.C. Circuit relied on 28 U.S.C. § 2106, which contained language identical in relevant respects to that in D.C. Code § 17-306, in concluding that it could vacate a conviction rather than address a difficult merits question where there was "no need to resolve the issue on the merits." 432 F.2d at 606. There, the defendant was convicted on two robbery counts and given concurrent sentences. *Id.* at 604. There was a "substantial question" about the validity of one of the convictions. *Id.* at 605. Because the court was affirming the other conviction and sentence, it saw "no reason to devote [its] time and energies to the research, and opinion-writing, incident to appropriate determination of an issue not governed by controlling precedent when no present public interest or need [was] furthered thereby." *Id.* at 606. The court noted that "[i]t better serves the general interest of the administration of justice if the court limits its resources to the determination of those questions and cases that must be decided, especially in view of the ever[-]mounting docket that besets this and other appellate courts." *Id.* The court emphasized its "broad discretion" under 28 U.S.C. § 2106 "to direct the entry of such judgment or order as will further the interest of justice" and noted that vacating a conviction without reaching the merits is "in the overall interest of justice" where it does not "impair any need of the government," avoids adverse consequences for the defendant, and furthers the general interest of the administration of justice. *Id.* *Hooper* is binding precedent on this court under *M.A.P. v. Ryan*, 285 A.2d 310 (D.C. 1971) (recognizing that decisions of the D.C. Circuit prior to February 1, 1971, constitute the case law of the District of Columbia).

The question, then, is whether we *should* grant the government's motion in this case. We conclude that we should, for the following reasons.

First, even while "it is our 'general practice' to accept a concession by the government that the trial court committed error," *V.C.B. v. United States*, 37 A.3d 286, 290 (D.C. 2012) (quoting *Ellis v. United States*, 941 A.2d 1042, 1048 (D.C. 2008)), we note that that is not precisely what we are doing here. In relying on the United States' statements about why it is no longer enforcing Section 22-4504(a-1) and therefore does not seek to enforce it on direct appeal either, we defer to the United States' position as an extension of its prosecutorial discretion. *See, e.g.*, *District of Columbia v. Economides*, 968 A.2d 1032, 1036 (D.C. 2009) (rejecting a challenge to an exercise of prosecutorial discretion and noting that "the power to decide when to . . . prosecute[ ] lies at the core of the Executive's duty to see to the faithful execution of the laws" (citation modified)). We are not accepting or even proceeding on the assumption that the statute is unconstitutional, and we express no view on that question. Thus, contrary to PDS's argument, in vacating Mr. Carruth's conviction we are not setting any "precedent" that would require a published opinion explaining the basis of our decision.

Second, and relatedly, we understand the United States' position in this case as more than a mere change in its argument in this appeal. It has represented in its

motion that it is "not prosecuting violations of Section 22-4504(a-1)" as a matter of policy because of its view that Section 22-4504(a-1) runs afoul of the Second Amendment. *See Petite v. United States*, 361 U.S. 529, 530-31 (1960) (vacating and remanding in light of the United States' representation that a certain prosecution was inconsistent with the "general policy" of the Department of Justice). We rely on this representation with the understanding that it stems from the special ethical obligation undertaken by a prosecutor: the United States' "interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *In re Howes*, 52 A.3d 1, 18 n.21 (D.C. 2012) (citation modified); *see generally* D.C. R. Pro. Conduct 3.8. We emphasize, too, that counsel representing the United States (like all attorneys practicing before this court) owe this tribunal a duty of candor that prohibits them from knowingly making or failing to correct a "false statement of fact," D.C. R. Pro. Conduct 3.3(a), and that failing to uphold this obligation can result in discipline, *see* D.C. R. Pro. Conduct 8.4(c). We assign weight to the United States' representations regarding its policy of nonenforcement of Section 22-4504(a-1), and its intent to move to dismiss Mr. Carruth's rifle-carrying count on remand, with these ethical considerations in mind.

Third, the Second Amendment issue in this case is "complex" and not one we could "easily resolve," especially in light of the rapidly evolving jurisprudence in this area of the law. *Rose v. United States*, 629 A.2d 526, 537 (D.C. 1993); *see*

*Benson v. United States*, 355 A.3d 190, 191 (D.C. 2026) (granting rehearing en banc to consider, among other things, "[w]hether the District's ban on firearm magazines capable of holding 'more than 10 rounds of ammunition' violates the Second Amendment . . . [and] [w]hether the District's licensing and registration requirements violate the Second Amendment").[2] As a result, our restraint in this instance flows in part from the principles undergirding the doctrine of constitutional avoidance: we try not to "address constitutional issues . . . when the case may be resolved on different grounds." *Gaynor v. United States*, 16 A.3d 944, 948 (D.C. 2011).

---

[2] The now-vacated panel opinion in *Benson* also addressed a motion to vacate filed by the United States based on its belief that the District's large-capacity ammunition feeding device statute is unconstitutional under the Second Amendment. *Benson v. United States*, 352 A.3d 719, 743 n.20 (D.C. 2026), *vacated*, 355 A.3d 190 (D.C. 2026); *see* Mot. to Vacate Conviction, *Benson v. United States*, 23-CF-0514 (Sept. 9, 2025). That motion was unopposed by the parties to that appeal but was opposed by PDS, acting as amicus. *See* Mot. to Vacate Conviction at 1, *Benson*, 23-CF-0514; Resp. to Appellee's Mot. to Vacate (Intervenor) at 1, *Benson*, 23-CF-0514 (Sept. 9, 2025); Resp. to Appellee's Mot. to Vacate (Amicus Curiae), *Benson*, 23-CF-0514 (Sept. 16, 2025). The *Benson* panel addressed the merits of the appellant's Second Amendment challenge to that statute primarily because of its view that "the constitutional infirmity with the capacity ban infect[ed] all of Benson's convictions, so the constitutional validity of the District's ban on 11+ magazines has downstream effects for convictions the United States still defends." 352 A.3d at 743 n.20. It also concluded that the issue was not "moot" because it was "capable of repetition yet evading review" and expressed concern that the United States might "resume prosecuting these offenses if, for instance, there is a change in administration." *Id.*

Moreover, there is substantial uncertainty about whether we would even reach the Second Amendment question. As discussed above, Mr. Carruth has raised a sufficiency challenge to his rifle-carrying conviction, presenting open questions of statutory interpretation and the application of an affirmative defense. The District of Columbia argues in its merits brief that Mr. Carruth waived or forfeited any Second Amendment challenge. And PDS has not urged us to decide the sufficiency issue notwithstanding the United States' motion to vacate. While we likewise express no view on the merits of these arguments, they undermine PDS's suggestion that this case is a particularly good vehicle to decide the Second Amendment issue.

Finally, as we have noted, it is significant that no party to this appeal (PDS is an amicus) opposes the United States' motion. In this context, guided by the precept that "courts should not decide more than the occasion demands," *Hensley v. D.C. Department of Employment Services*, 283 A.3d 123, 129 n.8 (D.C. 2022) (citation modified), the unanimous lack of opposition to the motion to vacate by the parties to this appeal also contributes to our conclusion that it is "just in the circumstances" to grant it. D.C. Code § 17-306.[3]

---

[3] By the same token, we note that vacating Mr. Carruth's rifle-carrying conviction would have little practical effect on his sentence. *See Hooper*, 432 F.2d at 606 (explaining that "sound doctrine supports the vacating of a judgment on a count that has become superfluous," where the vacatur of the conviction did not

To summarize, we grant the United States' motion to vacate because (1) the United States has represented that it is no longer prosecuting violations of the statute due to its belief that the statute is unconstitutional, and we defer to that expression of prosecutorial discretion; (2) all parties agree that, in light of that representation, the conviction should be vacated, and to nonetheless reach the merits and expose Mr. Carruth to the risk of affirmance would be unjust under the circumstances; (3) the complexity of the constitutional issue as well as the possibility that we would not reach it even if we denied the United States' motion counsel in favor of granting the motion; and (4) where no party opposes the United States' motion, principles of judicial restraint support the view that granting the motion is the more prudent path.

---

affect the defendant's overall criminal punishment for his convictions in the case). Mr. Carruth was given an eighteen-month prison sentence with three years of supervised release and eighteen months of supervised probation, with all but the probation suspended, for his rifle-carrying conviction; a nine-month prison sentence and eighteen months of supervised probation, with the prison sentence suspended, for his possession of an unregistered firearm conviction; and an identical nine-month prison sentence and eighteen months of supervised probation, with the prison sentence suspended, for his unlawful possession of ammunition conviction. All sentences were concurrent. Mr. Carruth was also fined a total of $200 under the Victims of Violent Crime Compensation Act ($100 for the rifle-carrying offense and $50 each for the other two offenses), and he was further required to register as a gun offender. That is, at the time he was sentenced, Mr. Carruth was obligated to serve a total of eighteen months of supervised probation for all three of his offenses combined, a time period which has long since elapsed. While Mr. Carruth's rifle-carrying conviction is not "superfluous," it is nevertheless our view that the "public interest" does not support "retain[ing] the conviction," in part because vacating it would not meaningfully affect Mr. Carruth's overall sentencing scheme. *Hooper*, 432 F.2d at 606.

Consistent with our longstanding practice with respect to unopposed motions to vacate a conviction on appeal, we conclude that these factors, taken together, make it "just in the circumstances," D.C. Code § 17-306, to grant the United States' motion to vacate Mr. Carruth's rifle-carrying conviction.

### III.    The Sixth Amendment Challenge

Because we vacate Mr. Carruth's conviction for violating D.C. Code § 22-4504(a-1), we address the merits only of Mr. Carruth's Sixth Amendment argument, which implicates both of his other convictions. First, applying the binding Supreme Court jurisprudence in this area of the law, including the recently decided *Villarreal v. Texas*, 607 U.S. 465 (2026), we conclude that the trial court did not violate Mr. Carruth's Sixth Amendment rights when it ordered him not to discuss "the substance of his testimony" with his lawyer during a one-hour lunch break. Second, we briefly address the effect of *Villarreal* on our precedents in this area of the law.

### A.    Standard of Review

"We review [a] constitutional law question de novo," *Solomon v. United States*, 120 A.3d 618, 620 (D.C. 2015) (citation modified), and the parties agree that

de novo review applies to Mr. Carruth's Sixth Amendment claim, so we apply that standard of review.

## B.    Discussion

### 1.    Whether the trial court's order violated Mr. Carruth's Sixth Amendment right to the assistance of counsel

"The Sixth Amendment guarantees as 'fundamental' a criminal defendant's right to consult with his counsel." *Villarreal*, 607 U.S. at 470. But when a defendant "becomes a witness, . . . a competing duty arises: the duty to advance 'the truth-seeking function of the trial.'" *Id.* at 472 (quoting *Perry v. Leeke*, 488 U.S. 272, 282 (1989)). Trial judges are empowered with an array of procedural tools to safeguard this truth-seeking function, including "[s]equestering a witness over a recess called before testimony is completed." *Geders v. United States*, 425 U.S. 80, 87 (1976). Thus, when a criminal defendant testifies, a trial court's authority to protect the truth-seeking function can run headlong into the defendant's Sixth Amendment rights. *See Villarreal*, 607 U.S. at 470-71.

Prior to *Villarreal*, the Supreme Court had twice addressed the extent to which a defendant may be prohibited from consulting with their attorney while testifying: first in *Geders*, and then in *Perry*, thirteen years later. In *Geders*, the Court held that a trial court's order prohibiting a testifying defendant from speaking to his lawyer

"about anything" during an overnight recess in the middle of the testimony violated the Sixth Amendment. 425 U.S. at 91. In *Perry*, by contrast, the Court held that an order prohibiting a testifying defendant from speaking to his lawyer during a fifteen-minute recess in the middle of the testimony did not violate the Sixth Amendment. 488 U.S. at 283-84.

*Villarreal* addressed the constitutionality of a trial court order that "prohibited Villarreal's lawyers from 'managing' his 'ongoing testimony'" during an overnight recess while Mr. Villarreal was still on the stand. 607 U.S. at 477 (emphasis omitted). Harmonizing the reasoning and the outcomes in its prior cases, the Court explained that "[t]he difference between *Perry* and *Geders* is not the quantity of communication restrained but its constitutional quality." *Id.* at 476 (quoting *United States v. Padilla*, 203 F.3d 156, 160 (2d Cir. 2000)). Two "content-based premises" underlie both *Perry* and *Geders*: (1) "[a] midtestimony defendant does not have a protected Sixth Amendment right to discuss his ongoing testimony with his lawyer" and (2) "a short break in a defendant's appearance on the witness stand is unlikely to feature" constitutionally protected topics such as "the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain." *Id.* at 474 (quoting *Perry*, 488 U.S. at 284, and explaining that "the same content-based premises undergird *Geders*," albeit "in less prominent form").

Building on these principles, the Court held in *Villarreal* that "for the duration of the defendant's time on the stand, consultation about the testimony itself—rather than incidental discussion of testimony in service of protected topics—sheds its constitutional protection." *Id.* at 475. And because the trial judge's order forbade Mr. Villarreal's attorney only from "managing" Mr. Villarreal's ongoing testimony—that is, seeking to "shape" its future course—that order "did enough to tailor the 'quality' of forbidden consultation . . . to the rule [drawn] from *Geders* and *Perry*" such that it "f[e]ll[ ] on the constitutional side of [the] line." *Id.* at 477-78. The Court emphasized, however, that "many topics a testifying defendant and his lawyer might discuss during a midtestimony overnight recess remain protected," including "advice about trial strategy"; "advice on whether and why he should consider a guilty plea[,] even if the 'why' includes the impact of his ongoing testimony on the trial's prospects"; and any other attorney-client collaboration involving only "incidental discussion of testimony." *Id.*

With *Villarreal*'s synthesis of *Geders* and *Perry* in hand, we now turn to the no-conferral order issued in this case. Before the trial court declared a lunch recess, counsel for the United States asked the court "to instruct the witness not to discuss *his testimony, as he's still testifying*, with his counsel." The trial court then addressed Mr. Carruth: "So now that you're on the stand, Mr. Carruth, you should not be speaking to your lawyer *about the substance of your testimony*." Mr. Carruth's

counsel objected, emphasizing that, in his view, Mr. Carruth had "an *absolute right* to discuss what he has said on the stand, what it means," including "what has happened, why it's happened, [and] what the theory of the case is." In response, the trial court explained that Mr. Carruth is "in the middle of testifying, so he can't stop and say I need to talk to my lawyer about the substance of my testimony in the middle of his testimony[.]" Mr. Carruth's counsel insisted that his client had "every right to discuss *the case* and what went on," but the trial court repeated its admonition to Mr. Carruth: "don't discuss your testimony with anyone, please."

The trial court's order in this case did not violate Mr. Carruth's Sixth Amendment right to the assistance of counsel because it prohibited only the "subset of consultation" that the Sixth Amendment does not protect: the "discussion of testimony for its own sake." *Villarreal*, 607 U.S. at 475. Mr. Carruth asserts that the court's order did not "clearly define the limitations of the conversations" and lacked "tailoring qualifications" such that it "encompassed 'protected topics,'" but that is not our reading of the court's oral order in light of the entire context of the discussion. First, the court's repeated references to the "substance" of Mr. Carruth's testimony convince us that its overriding concern was preventing "real-time feedback aimed at chameleonic adjustments in the defendant's testimony," which is what *Villarreal* means by "the discussion of testimony for its own sake." *Villarreal*, 607 U.S. at 476; *see also id.* at 478 n.5 (explaining that an attorney's advice that

"seeks to shape future testimony in light of past testimony" is unprotected by the Sixth Amendment, even if that advice is prefaced with an explanation "that a defendant's 'chances of acquittal will improve' if he adjusts his testimony"). Second, we are mindful that the lunch break in Mr. Carruth's case occurred in the middle of his cross-examination, and that "it is essential . . . to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens*, 446 U.S. 620, 626-27 (1980). It appears clear to us from the record that the trial court's prohibition on consultation regarding the "substance of [Mr. Carruth's] testimony" sought to ensure that Mr. Carruth, as a testifying witness, would not have "an opportunity to regroup and regain a poise and sense of strategy that the unaided witness would not possess," which could undermine this truth-seeking goal. *Perry*, 488 U.S. at 282.

Mr. Carruth argues that his counsel's statements show that he wanted to discuss "matters that may or may not involve [his] exact testimony[,] but other issues surrounding it," and that the trial court's order prohibited him from doing so. With the benefit of *Villarreal*, he makes a similar argument in his supplemental briefing, urging that "the trial court's order encompassed trial strategy and those other permitted topics that the Supreme Court has now held are to be allowed."

To be sure, Mr. Carruth's trial counsel might have wanted to discuss case-related matters beyond the substance of Mr. Carruth's ongoing testimony, considering particularly that he argued that Mr. Carruth had "every right to discuss *the case*" with him. But Mr. Carruth's counsel also asserted that Mr. Carruth possessed an "absolute right" to discuss his testimony at any time, which mirrors the "hardline" position that the Supreme Court firmly rejected in *Villarreal*. 607 U.S. at 474-75 (explaining that Mr. Villarreal sought recognition that "the conferral right is absolute and unqualified" during an overnight recess). In context, then, we read the trial court's closing instruction—"Don't discuss your testimony with anyone"—as a rejection of this maximalist view rather than a sweeping ban on any mention of the ongoing testimony at all.

Moreover, the trial court did not prohibit Mr. Carruth from discussing "the case" entirely; it prohibited only consultation about "the substance of [his] testimony" in the middle of his cross-examination. This proscription dovetails with one of the "content-based" premises that *Villarreal* extracted from *Perry*: that "a short break in a defendant's appearance on the witness stand is unlikely to feature" discussion of constitutionally protected topics like "the availability of other witnesses, trial tactics, or even the possibility of negotiating a plea bargain." *Villarreal*, 607 U.S. at 474 (citing *Perry*, 488 U.S. at 284). As our review of the record in this case makes clear, the "key observation" *Perry* made about the fifteen-

minute recess in that case is true of the hourlong lunch break in Mr. Carruth's case as well, and the trial court's order reflects that common-sense understanding. *Id.* at 472.

We do not suggest that a no-conferral order issued during a brief daytime recess is necessarily immune from constitutional scrutiny because of the "practical" reality that such a recess is unlikely to involve discussion of constitutionally protected topics. *Id.* To do so would risk drawing the same kind of "temporal" line that the Court expressly rejected in *Villarreal*. *Id.* at 473. Instead, consistent with *Villarreal*'s explication of the law, we hold only that under these circumstances, the trial court's order did no more than prohibit "discussion of testimony as such, lest that discussion shape future testimony 'in light of the testimony already given.'" *Id.* at 478 (citation modified). Accordingly, the trial court's order did not violate Mr. Carruth's Sixth Amendment right to the assistance of counsel.

### 2. *The effect of* Villarreal *on our precedents*

Thus far, our discussion has focused on *Villarreal* and other Supreme Court cases because those cases are "clearly controlling doctrine" that we are obligated to follow. *Picon v. United States*, 343 A.3d 57, 68 (D.C. 2025) (quoting *Teoume-Lessane v. United States*, 931 A.2d 478, 494 (D.C. 2007)). This is not, however, our first case applying the Sixth Amendment in this area. We have done so on three prior

occasions: (1) as an en banc court in *Jackson v. United States*, 420 A.2d 1202 (D.C. 1979) (en banc), which followed *Geders* but predated *Perry*; (2) some thirty years later in *Martin v. United States*, 991 A.2d 791 (D.C. 2010); and (3) most recently in *Petty v. United States*, 317 A.3d 351 (D.C. 2024), a panel disposition that produced no majority opinion.

*Jackson* held that an order prohibiting a testifying defendant from "discussi[ng] [his] testimony" with counsel during a lunch break violated the Sixth Amendment because the defendant "had the right to discuss the entire case, including his own testimony, with his attorney." 420 A.2d at 1205. *Martin* recognized that the portion of *Jackson* holding "that an order barring the defendant from conferring with his lawyer violates the Sixth Amendment regardless of the brevity of the order's duration" was no longer valid because it "ha[d] been superseded by *Perry*." 991 A.2d at 794 n.9. Nevertheless, *Martin* reaffirmed *Jackson*'s holding that "the defendant 'had the right to discuss the entire case, including his own testimony, with his attorney'" as applied to "*overnight* recesses." *Id.* at 794 (emphasis added). *Martin* then held that a prohibition on the "discussion of appellant's testimony" during a weekend recess while the defendant was on the stand violated the Sixth Amendment. *Id.* Finally, *Petty* addressed an order prohibiting the defendant from discussing his testimony during a nineteen-and-a-half hour overnight recess. *See* 317 A.3d at 352 (Easterly, J. concurring in the

judgment). Each of the three opinions issued by the panel members in that case agreed that this order violated the Sixth Amendment, *see id.* at 352, 363-64, 368, but the panel fractured over whether, and why, this violation required vacatur of Mr. Petty's convictions, *see id.* at 352, 365-66, 368.

Because we decided *Jackson*, *Martin*, and *Petty* prior to *Villarreal*'s instruction that the constitutionality of a conferral ban depends on its "content" rather than its duration or timing (during the day as opposed to overnight or over a weekend), 607 U.S. at 474, the opinions in those cases understandably did not focus on articulating the substantive scope of the challenged conferral orders. This does not mean, as the United States suggests, that the cases (especially *Jackson* and *Martin*) have necessarily been "overrule[d]" by *Villarreal* in their entirety. We decline to take the "significant" step of saying as much today, *Picon*, 343 A.3d at 68, because doing so is not required to answer the question presented in this case, where the no-conferral order was limited in substantive scope and imposed during a brief daytime recess (as opposed to a lengthier overnight one). *Cf. Harris v. United States*, 594 A.2d 546, 548 & n.3 (D.C. 1991) (noting the potential conflict between *Perry* and *Jackson* but declining to "decide whether the Supreme Court's decision in *Perry* . . . overrules or limits our decision in *Jackson*").

In addition, we note that *Villarreal* itself distinguished "conferral orders banning *any and all* discussion of the defendant's testimony, even if incidental to protected topics," 607 U.S. at 479, from a "midtestimony conferral order prohibiting discussion of testimony as such, lest that discussion shape future testimony in light of the testimony already given," *id.* at 478 (citation modified). It is not clear to us whether the court in *Martin*, or the various opinions in *Petty*, viewed the no-conferral orders at issue in those cases as prohibiting the discussion of a defendant's testimony even when such discussion was "incidental to protected topics," in contrast to the more focused (and constitutional) restrictions at issue in *Villarreal* and in this case. *Id.*

Nevertheless, we reiterate our point in *Martin* that *Jackson*'s Sixth Amendment holding—that an order prohibiting a defendant from discussing his testimony with his lawyer during a lunch break violates the Sixth Amendment—was "superseded by *Perry*." 991 A.2d at 794 n.9. *Jackson* proceeded on the assumption that the defendant "had the right to discuss the entire case, including his own testimony, with his attorney," full stop. 420 A.2d at 1205. But *Perry* held, and *Villarreal* reaffirms, that "a midtestimony defendant does not have a protected Sixth Amendment right to discuss his ongoing testimony with his lawyer," *Villarreal*, 607 U.S. at 474 (citing *Perry*, 488 U.S. at 284)—in other words, that a defendant does *not* have an unrestricted right to "discuss . . . his own testimony [ ] with his

attorney." *Jackson*, 420 A.2d at 1205. Consistent with *Martin*, we do not consider ourselves bound by this portion of *Jackson*, because it has been "overruled by" subsequent Supreme Court precedent. *Teoume-Lessane*, 931 A.2d at 495. We leave for another day any further implications of *Villarreal*.

## IV.    Conclusion

For the foregoing reasons, we affirm Mr. Carruth's convictions for possessing an unregistered firearm under D.C. Code § 7-2502.01(a) and possessing ammunition without a valid firearm registration certificate under D.C. Code § 7-2506.01(a)(3). We vacate Mr. Carruth's conviction for carrying a rifle in the District under D.C. Code § 22-4504(a-1). We remand for further proceedings consistent with this opinion.

*So ordered.*